13 A.3d 416

KATHLEEN JONES, LAKESHA JONES, SYLVIA FLYNN AND HELEN L. EWELL, ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED, PLAINTIFFS–APPELLANTS, v. GEORGE W. HAYMAN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS; JAMES BARBO, IN HIS OFFICIAL CAPACITY AS ACTING DEPUTY COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS; LYDELL SHERRER, IN HIS OFFICIAL CAPACITY AS ACTING ASSISTANT COMMISSIONER FOR THE DIVISION OF OPERATIONS OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS, WILLIAM HAUCK, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE EDNA MAHAN CORRECTIONAL FACILITY, MICHELLE RICCI, IN HER OFFICIAL CAPACITY AS ADMINISTRATOR OF THE NEW JERSEY STATE PRISON, ALFRED N. KANDELL, IN HIS OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR OF THE NEW JERSEY STATE PRISON, JAMES DRUMM, IN HIS OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR OF THE NEW JERSEY STATE PRISON, HERBERT A. KALDANY, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF PSYCHIATRY OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS, AND THOMAS F. DECHAN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF EDUCATION OF THE NEW JERSEY STATE PRISON, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 27, 2010—Decided February 25, 2011.

Before Judges FUENTES, ASHRAFI and NUGENT.

*Mie Lewis* (American Civil Liberties Union Foundation Women's Rights Project) of the New York Bar, admitted pro hac vice, argued the cause for appellants (*American Civil Liberties Union of New Jersey Foundation*, attorneys; *Ms. Lewis, Lenora M. Lapidus* and *Edward L. Barocas*, on the brief).

*Dianne M. Moratti*, Deputy Attorney General, argued the cause for respondents (*Paula T. Dow*, Attorney General, attorney; *Melissa H. Raksa*, Assistant Attorney General, of counsel; *Ms. Moratti*, on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

This appeal requires us to consider under what circumstances a plaintiff, who brings an action pursuant to statutes containing fee-shifting provisions, may be deemed a prevailing party under the catalyst theory when the underlying action is dismissed as moot without a final judicial determination on the merits of the case.

Plaintiffs Kathleen Jones, Lakesha Jones, Sylvia Flynn, and Helen Ewell were four inmates initially confined in the Edna Mahan Correctional Facility (EMCF), an all-female penal facility. Following their transfer, along with several other women prisoners, to the previously all-male New Jersey State Prison (NJSP), plaintiffs brought a class action suit against the New Jersey Department of Corrections (DOC) alleging discriminatory and unconstitutional conditions of confinement in violation of Article I, Paragraph 1 of the New Jersey Constitution; the Law Against

Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42; and the New Jersey Civil Rights Act, *N.J.S.A.* 10:6–1 to –2.

In the course of pre-trial proceedings, plaintiffs successfully obtained certification to proceed as a class and were granted a preliminary injunction restraining the DOC from continuing to transfer women inmates to NJSP. Shortly after the court granted the preliminary injunction, defendants transferred all of the women inmates (including plaintiffs) who were held in NJSP back to the female facility. The trial court thereafter dismissed plaintiffs' underlying action as moot.

Plaintiffs then sought attorneys' fees under *N.J.S.A.* 10:5–27.1 and *N.J.S.A.* 10:6–2, claiming that they were "prevailing parties" in the litigation because they (1) successfully obtained a preliminary injunction barring defendants from continuing to transfer women inmates into NJSP; and (2) were the catalyst for defendants' actions in transferring plaintiffs and other members of the class back to the female penal facility.

The trial court denied plaintiffs' application for counsel fees, finding that they were not a "prevailing party" because plaintiffs did not obtain a judgment on the merits, their suit did not have a basis in law, and the legal action "did not play a role" in the DOC's decision to transfer plaintiffs from NJSP back to the female facility.

We now reverse and remand for the trial court to apply the standards articulated by our Supreme Court in *Mason v. City of Hoboken,* 196 *N.J.* 51, 70–79, 951 *A.*2d 1017 (2008), and more recently reaffirmed and explained in our opinion in *D. Russo, Inc. v. Township of Union,* 417 *N.J.Super.* 384, 9 *A.*3d 1089 (App.Div. 2010). The following facts will inform our analysis of these issues.

I

Commencing in March 2007, the DOC transferred approximately forty female prisoners from EMCF, New Jersey's sole women's prison, to NJSP, a maximum-security men's prison. Prior to this

transfer, all of the female prisoners had been housed exclusively at EMCF. According to DOC representatives, the transfer was made in order to reduce the overall inmate population at EMCF and to alleviate some of the strain on resources at that facility.

Plaintiffs filed this suit in the Chancery Division on December 12, 2007, alleging illegal confinement; discriminatory, cruel, and unusual conditions of confinement; and violations of the right to privacy in connection with the transfer and confinement of the women prisoners in the male penal institution. Plaintiffs sought class action status for a certified class consisting of "all general population women prisoners who are now or in the future will be confined in New Jersey State Prison." The complaint sought declaratory and injunctive relief, an award of costs, and the award of reasonable attorneys' fees.

The complaint recited numerous incidents of alleged mistreatment and unwarranted infringement of the female prisoners' right to privacy both in the manner the transfer was carried out and in the conditions the women were forced to endure while at NJSP. With respect to the transfer, plaintiffs alleged that the women held at EMCF were taken from their cells by "guards in full riot gear carrying batons, mace, and other weapons." Thereafter, each woman was taken to a separate room and compelled to strip naked "while guards, including male guards, observed her and filmed her with a video camera."

According to the complaint:

> Because many of the women held at EMCF have experienced sexual and physical abuse by men prior to and in some cases during their incarceration they were extremely frightened by the procedures employed during the transfer and by the prospect of transfer to a men's prison. Nursing and psychiatric staff had to be called to attend to the panic-stricken women, and many women were medicated or received increased dosages of medication.

Plaintiffs alleged equally harrowing experiences caused by the disparate conditions of confinement between the women at NJSP and the general population male inmates. The complaint alleged the imposition of restrictions on "medical care; legal access;

educational and other rehabilitative services; . . . work opportuni-
ties; and exercise facilities" for the female prisoners.

According to plaintiffs, female prisoners seeking mental health
care at NJSP were subjected to "dangerous and degrading condi-
tions" in the psychiatric unit, and female prisoners in general were
denied the "ability to maintain basic cleanliness with respect to
their bodies, clothing, and environment." In addition, the com-
plaint asserted that female prisoners were subject to "routine
exposure . . . to observation by male guards and civilian staff in
non-emergency situations while carrying out basic bodily functions
and while in states of nudity."

On January 10, 2008, plaintiffs moved for a temporary restrain-
ing order and preliminary injunction prohibiting any further trans-
fer of female prisoners to NJSP. According to plaintiffs, they took
this step after being informed by prison staff that future transfers
of female prisoners to NJSP were imminent. Shortly thereafter,
the parties entered into a consent order that, with a limited
exception for female inmates transferred to the administrative
segregation or stabilization units, prohibited any further transfer
of female inmates to NJSP pending further order from the court.

Despite these initial indications of compromise and agreement,
defendants actively opposed plaintiffs' motions seeking class certi-
fication and preliminary injunctive relief, and in lieu of filing a
responsive pleading, cross-moved to dismiss the complaint or,
alternatively, for summary judgment.[1] The evidence presented by
defendants at this stage of the proceedings was derived entirely
from the certification of Michelle R. Ricci, the Administrator of
NJSP, dated February 7, 2008.

In this twenty-six page certification, containing 102 numbered
paragraphs and forty-five pages of exhibits, Ricci first provided an
overview of her experiences holding various administrative posi-

---

[1] Although not directly related to the issues before us, we note that plaintiffs
also sought sanctions against defendants on a variety of grounds, including
inducing false testimony and invasions of the attorney-client privilege.

tions in the DOC. Of particular relevance here, Ricci averred that beginning on March 6, 2007, thirteen "female general population inmates" were transferred from EMCF into NJSP, and, eight days later, twenty more women inmates from EMCF were transferred to NJSP. As of February 7, 2008, a total of thirty-six women taken from the general population of EMCF had been transferred and confined in unit 1EE in the South Compound of NJSP. The entire facility housed 1,076 "general population" male inmates at that time.[2]

The February 2008 Ricci certification was a point-by-point rebuttal of the charges of mistreatment and inadequate, constitutionally impermissible conditions levied by plaintiffs in their verified complaint. Ricci described in detail the treatment, programs, and facilities made available to the women inmates confined at NJSP in the areas of medical services, access to legal resources, education, laundry and personal hygiene, hours of cell confinement, recreational activities, visitation schedules, religious services, telephone access, job assignments, privacy concerns, and cleaning supplies.

The court denied defendants' motion seeking to dismiss the case and granted plaintiffs' motions for class certification and preliminary injunction. In granting plaintiffs' motion for preliminary injunctive relief, the court relied on the standards articulated by the Court in *Crowe v. De Gioia*, 90 *N.J.* 126, 132–34, 447 *A.*2d 173 (1982).

Under *Crowe*, in order to enjoin defendants from continuing to transfer women inmates to NJSP at this stage of the litigation, the trial court was required to find that: (1) injunctive relief was necessary to prevent irreparable harm to the members of the

---

[2] The term "general population inmate" is used to distinguish those inmates from other inmates who are confined in special segregated areas of the prison based on their disciplinary record, mental health concerns, or other factors necessitating their separation from the general population. *See N.J.A.C.* 10A:5–1.3. According to Ricci, when these inmates are included, the total inmate population at NJSP as of February 2008 was 1,816.

class; (2) the claims asserted by plaintiffs on behalf of the class were supported by settled legal rights; (3) plaintiffs made a preliminary showing of a reasonable probability of ultimate success on the merits; and (4) the relative hardship to the parties caused by the granting of injunctive relief weighed in favor of plaintiffs. *Ibid.*

Applying the first prong of *Crowe* to the facts alleged in the complaint, the court found that the assertions that the women confined at NJSP were "deprived of psychiatric and medical care, items of basic hygiene, and privacy from male guards when undressing, showering or using the toilets" constituted irreparable harm because these allegations "add up to a situation where the women prisoners are suffering beyond a severe personal inconvenience."

The second prong of *Crowe* required the court to determine whether plaintiffs' claims were based on legally settled rights. *Id.* at 133, 447 *A.*2d 173. The trial court found that claims made under Article I, Paragraph 1 of the New Jersey Constitution, the LAD, and the New Jersey Civil Rights Act were indeed grounded on "legally settled rights."

Under the third prong of *Crowe* the court was required to find that plaintiffs had a reasonable probability of ultimate success on the merits. *Ibid.* However, the trial court's analysis instead focused solely on whether the issuance of injunctive relief would preserve the status quo. Guided by this concern, the court concluded that enjoining defendants from continuing to transfer women inmates to NJSP "will not change the conditions of confinement at the NJSP, nor will it change the institution where Plaintiffs and other women prisoners are being confined." The court made no specific findings on the question of the probability of success on the merits of plaintiffs' underlying suit; thus, that question arguably remains unresolved.

Finally, the fourth prong of *Crowe* required the court to balance the relative hardships caused by the issuance of restraints. *Id.* at 134, 447 *A.*2d 173. Here, the trial court found:

> If an injunction were not granted, women prisoners transferred over to the NJSP would be subject to the alleged inhumane and inequitable conditions present there. Furthermore, the hardship to the women prisoners there would likely become exacerbated by the increase in the number of women prisoners confined at the NJSP. However, if the injunctive relief is granted, Defendants would not be permitted to transfer other women prisoners to the NJSP. Moreover, Defendants have not provided specifically how an injunction which simply maintains the status quo harms them in this matter. Therefore, the Court finds that Plaintiffs have satisfied the final prong of the *Crowe* test.[3]

On September 3, 2008, the DOC transferred all general population female prisoners confined at NJSP back to EMCF. Defendants thereafter moved for summary judgment, arguing that plaintiffs' case had been rendered moot by this action. In support of their motion, defendants submitted the certifications of DOC Commissioner George Hayman, EMCF Administrator William Hauck, NJSP Administrator Ricci, DOC Assistant Commissioner of Programs Brigite Mitchell–Morton, State Parole Board Director of Community Programs Division Leonard Ward, and DOC Deputy Commissioner for Operations Lydell Sherrer.

Although all the public officials attempted to focus their statements on their particular area of responsibility within the prison system, the central theme advanced in each of these certifications was two-fold: (1) the case was now moot because the women had been returned to EMCF, thus de facto eliminating all of the conditions complained of by plaintiffs; and (2) the decision to transfer the women back to EMCF was wholly unrelated to plaintiffs' lawsuit. The latter point was central to defendants' argument opposing plaintiffs' motion for counsel fees. The following excerpts from DOC Commissioner Hayman's certification encapsulate defendants' position before the court:

---

[3] The trial court did not decide defendants' motion for reconsideration of these rulings before dismissing plaintiffs' complaint as moot. Thus, the issue of whether the court erred in granting preliminary injunctive relief at this stage of the litigation is not directly before us. The question remains relevant, however, to the extent it may bear on the trial court's ultimate determination of whether plaintiffs are entitled to any award of counsel fees.

In March 2007, general population female inmates were transferred from EMCF to NJSP in order to reduce the overall inmate population at EMCF and alleviate some of the strain on resources at that facility.

The transfer was only intended to be temporary. The general population female inmates were returned to EMCF once the overall population at EMCF had dropped to a point where the facility's resources would provide the appropriate level of care, custody and security.

Since the transfer in March 2007, the EMCF population numbers have been steadily declining. This reduction in population has had a corresponding positive effect on the overall facility. Though the population began to decrease shortly after the March 2007 transfer, the general population female inmates were not immediately returned to EMCF in order to allow for further monitoring of the fluctuation in the population to determine whether the overall decline was a temporary condition or indicative of a more permanent trend.

After a sufficient period of time, it was determined that the decrease in the population was consistent and, as a result, it was the appropriate time to return the general population female inmates back to EMCF.

The decision to return the female general population inmates to EMCF was based solely on operational reasons and totally unrelated to this litigation.

The trial court granted defendants' motion for summary judgment and dismissed the case as moot. Plaintiffs thereafter moved for an award of counsel fees, arguing that, under the catalyst theory, the court should consider them a prevailing party on three grounds: (1) plaintiffs' lawsuit prompted defendants to improve significantly the conditions of confinement for the women inmates while at NJSP; (2) despite defendants' recent statements otherwise, there was a factual nexus between plaintiffs' legal action and interim relief obtained in the form of class certification and preliminary injunction, and defendants' decision to return the women to EMCF; and (3) plaintiffs' legal action and the interim relief awarded by the court had a basis in law. Plaintiffs also requested that the court conduct an evidentiary hearing during which both sides could present evidence in support of their respective positions.

The court denied plaintiffs' motion for counsel fees without a hearing. Relying principally on *Davidson v. Roselle Park Soccer Federation*, 304 *N.J.Super.* 352, 700 *A.*2d 900 (Ch.Div.1996), a trial court opinion that predated our Supreme Court's decision in

*Mason, supra,* 196 *N.J.* 51, 951 *A.*2d 1017, the trial court reached the following conclusion:

Since this matter has not been litigated and was dismissed as moot, Plaintiffs never received any relief that had an adequate basis in law sufficient to grant attorney's fees.

Additionally, the Court finds that Plaintiffs are not the prevailing party since it has never made a ruling on the legality and constitutionality of the conditions faced by the female litigants at NJSP. The preliminary injunction merely represents a ruling to maintain the status quo and not a ruling on the merits of the action. Thus, the Court never ruled in favor of the Plaintiffs on this issue. Although, Plaintiffs prevailed in obtaining a preliminary injunction and class action certification, and sought reconsideration of these orders, before these reconsideration motions were decided, Defendants transferred the women inmates back to Edna Mahan. This action was found to have mooted the litigation for the reasons set forth in the Court's decision of May 23, 2008. Hence, the unsettled determination of these matters prior to dismissal cannot stand as a basis for finding Plaintiffs as the prevailing parties. In fact, the only settled motion is Defendants' Summary Judgment motion resulting in this matter being dismissed as moot.

The court also adopted the certifications submitted by defendants as the basis for rejecting plaintiffs' argument for the existence of a factual nexus between the legal action and defendants' decision to return the women to EMCF. Specifically noting the certification submitted by DOC Commissioner Hayman, the court found that "this litigation did not play a role in the transfer, but it was an operational decision made independent of this suit."

II

Plaintiffs now appeal, arguing that the trial court erred in its interpretation and application of the catalyst theory as adopted by our Supreme Court in *Mason, supra,* 196 *N.J.* 51, 951 *A.*2d 1017, for determining who is a prevailing party for purposes of awarding attorneys' fees under the fee-shifting provisions of the LAD, *N.J.S.A.* 10:5–27.1, and the New Jersey Civil Rights Act, *N.J.S.A.* 10:6–2. Plaintiffs also argue that the court erred as a matter of law in holding that the preliminary injunction granted prior to the dismissal of the case was insufficient to independently support a finding that plaintiffs were the prevailing party for the purpose of awarding attorneys' fees. We agree that the trial court misapplied the standards established by the Court in *Mason.* We

remand for the court to reconsider plaintiffs' motion for counsel fees and apply the legal principles we will discuss herein.

Under the catalyst theory adopted by our Supreme Court in *Mason*, and more recently reaffirmed and explained by this court in *D. Russo*, a plaintiff seeking an award of counsel fees as a prevailing party in an action brought under a fee-shifting statute is entitled to recover such fees if the suit "achieves the desired result because [it] brought about a voluntary change in the defendant's conduct." *Mason, supra,* 196 *N.J.* at 72, 951 *A.*2d 1017; *D. Russo, supra,* 417 *N.J.Super.* at 389, 9 *A.*3d 1089.

A plaintiff need not obtain a final judgment on the merits or secure a consent decree from a defendant in order to be considered a "prevailing party" under the catalyst theory. *Mason, supra,* 196 *N.J.* at 76, 951 *A.*2d 1017. In order to be awarded counsel fees under the catalyst theory, a plaintiff must demonstrate "(1) a factual causal nexus between the litigation and the relief ultimately achieved; and (2) that the relief ultimately secured by plaintiff had a basis in law." *Ibid.* (internal quotation marks and citation omitted).

We reverse the trial court's denial of plaintiffs' motion for counsel fees and remand for further analysis because the court's ruling was not grounded on the two-prong approach outlined in *Mason.* That being said, we also address two sub-elements of the *Mason* paradigm that have not received particularized appellate review, specifically: (1) how a court should determine whether a plaintiff presented the proofs necessary to meet the "causal nexus" requirement under the first prong of *Mason;* and (2) what a plaintiff needs to show to establish that the "relief ultimately secured had a basis in law." *Mason, supra,* 196 *N.J.* at 76, 951 *A.*2d 1017.

### Causal Nexus

As the Court indicated in *Mason*, to determine whether a plaintiff has established a causal nexus between the litigation and the actions taken by defendant, a trial court is required to "conduct [a] fact-sensitive inquiry on a case-by-case basis, evaluat-

ing the reasonableness of, and motivations for, an agency's decisions, and viewing each matter on its merits." *Mason, supra,* 196 *N.J.* at 79, 951 *A.*2d 1017.

When, as here, the extent and timing of the interim relief obtained by plaintiffs strongly suggests a causal link between the litigation and the actions taken by defendants, the burden shifts to defendants to show that plaintiffs' suit was not a catalyst for the actions taken. *Id.* at 80, 951 *A.*2d 1017. Defendants can meet this burden by producing evidence showing that the actions taken were wholly independent of plaintiffs' legal efforts. Self-serving certifications from agency officials are not in and of themselves sufficient to meet this burden of proof. Although the precise quantity and quality of proof necessary is always case-specific, the court's ultimate ruling must be supported by competent and credible evidence.

Here, the trial court erred by accepting at face value the factual allegations and ultimate legal positions advanced by defendants in their certifications, without affording plaintiffs the opportunity to challenge the veracity of the allegations proffered in these certifications. Furthermore, it can be argued that the record developed before the trial court undermines the independence of thought and action attested to by the agency officials at the latter stages of this litigation. More specifically, the issue of whether the transfer of the women to NJSP was always intended to be a temporary measure, as defendants claimed in the September 2008 certifications, or a permanent plan to relocate some of the women inmates to NJSP, as argued by plaintiffs, cannot be definitively settled by simply accepting defendants' unexamined version of the facts.

This factual uncertainty is manifested in the detailed, comprehensive certification submitted in February 2008 by NJSP Administrator Ricci in defense of the underlying suit. Conspicuously missing from Ricci's February certification is any direct statement, or even oblique indication, that the policy of transferring women inmates to NJSP was a temporary solution to the over-

crowded conditions at EMCF. Ricci's comments present a strong defense of the DOC's policy, without reservation of any kind as to the permanency of the transfers. Ricci's only intent was to rebut the allegations of mistreatment and unconstitutional conditions of confinement plaintiffs alleged they were subjected to at the men's facility.

In sharp contrast, all of the September 2008 certifications submitted after the return of the women to EMCF followed a concise, formulistic style best represented by Commissioner Hayman's certification, which averred that the transfer of the women to NJSP was always intended to be a temporary solution. Thus, for the first time in the course of the litigation, Hayman asserted that the decision to return the women to EMCF was wholly unrelated to and independent of plaintiffs' efforts in this lawsuit.

Whether Hayman's certification reflects the original policy of the DOC or is merely a strategic maneuver to avoid the imposition of counsel fees cannot be answered through the summary process employed by the trial court. The court should have addressed this apparent inconsistency in defendants' policy and position before deciding whether there was a factual causal nexus between the litigation and the relief ultimately achieved. This kind of fact-sensitive determination requires a plenary hearing in which both sides are afforded the opportunity to present evidence in support of their respective positions and to challenge a witness's veracity through cross-examination.[4]

### Basis In Law

In determining whether there is a "basis in law" for any relief secured by plaintiffs for purposes of awarding attorneys'

---

[4] We recognize that our Supreme Court has strongly discouraged trial courts from using "an attorney-fee application as an invitation to become mired in a second round of litigation." *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 24, 860 *A.2d* 435 (2004). That admonition is not relevant here, however, because the question before the court is not the amount of fees plaintiffs should receive, as was the case in *Furst,* but whether plaintiffs are entitled to *any* award of fees as a prevailing party under the catalyst theory.

fees under the catalyst theory, a court must consider plaintiffs' success in obtaining interim relief, as well as in defending against defendants' efforts for summary disposition of the litigation as a matter of law. Especially relevant to this analysis is the magnitude or degree of plaintiffs' success as compared to obtaining a complete and final judgment on the merits.

Here, plaintiffs successfully survived defendants' threshold attempts to dismiss their case in lieu of filing a responsive pleading and secured certification to proceed as a class, overcoming one of the most critically important procedural challenges associated with these types of cases and opening the door to obtaining the discovery necessary to substantiate their claims. Most notably, plaintiffs also obtained preliminary injunctive relief over defendants' strong objections, preventing other members of the class from enduring the hardships and indignities allegedly experienced by the thirty-six class members who were transferred to NJSP and arguably prompting defendants to abandon the policy at issue.

This kind of interlocutory relief established the legal viability of plaintiffs' claims in a variety of contexts and key phases of the litigation. On these facts, we are satisfied that plaintiffs met the "basis in law" prong under *Mason*. We nevertheless offer the following analysis as a means of providing some guidance to the trial court in these matters.

■ In cases with a procedural posture such as the one before us, where a defendant ceases the contested behavior before a final judicial determination on the merits of the underlying claim may be achieved by plaintiffs, the "basis in law" prong should be construed as providing a check against groundless or harassing litigation. The trial court must be satisfied that the underlying suit was not frivolous or unreasonable. *Idaho Conservation League, Inc. v. Russell*, 946 *F*.2d 717, 719–20 (9th Cir.1991).

■ This approach serves two salutary purposes. First, it gives a reasonably ascertainable meaning to the "basis in law" prong. Second, it discourages frivolous litigation while avoiding

the creation of an insurmountable roadblock to attorneys' fees for plaintiffs who successfully pursue a suit to the point of obtaining significant preliminary relief, only to see their claims mooted by the voluntary actions of a defendant whose primary motivation may be seeking to escape the fee-shifting consequences of his or her actions.

Stated differently, the "basis in law" prong should be construed in a manner that promotes the public policy underpinning fee-shifting statutes: to afford "access to the judicial process to persons who have little or no money with which to hire a lawyer by providing an incentive to lawyers to undertake litigation," *Best v. C & M Door Controls, Inc.,* 200 *N.J.* 348, 354, 981 *A.*2d 1267 (2009); and to ensure that plaintiffs who have *bona fide claims* can attract competent counsel in cases involving statutory rights, thereby giving substantive meaning to our commitment to the principle of "justice for all citizens." *New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr.,* 185 *N.J.* 137, 152–53, 883 *A.*2d 329 (2005) (citation omitted).

Finally, as we recognized in *D. Russo,*

> [P]laintiffs could be entitled to an award of at least a portion of their attorney's fees even if the catalyst theory were held to be inapplicable.
>
> . . . .
>
> Our courts also have recognized that success in obtaining preliminary injunctive relief may provide a sufficient foundation for an award of the attorney's fees under a fee-shifting statute even though the case became moot before a final adjudication.
>
> [*D. Russo, supra,* 417 *N.J.Super.* at 388–89, 9 *A.*3d 1089 (internal citations omitted).]

Here, the trial court failed to consider this alternative basis for awarding plaintiffs counsel fees in connection with their success in obtaining a preliminary injunction against defendants. If on remand the court were to find that plaintiffs remain unable to recover counsel fees as a prevailing party under the "causal nexus" prong of the catalyst theory, the court shall then determine whether plaintiffs are otherwise entitled to a partial award of

attorneys' fees for successfully securing preliminary injunctive relief.[5]

Reversed and remanded for the court to conduct a plenary hearing consistent with this decision. We do not retain jurisdiction.

---

[5] Given the concerns noted *supra* about the court's application of the standards under *Crowe* for granting preliminary injunctive relief, defendants should be permitted the opportunity to challenge the underlying basis for the issuance of the preliminary injunction as a defense to plaintiffs' application for counsel fees.